1 | JASON E. GUERRA (Bar No. 249278)
E-Mail: jguerra@guerra-law.com
GUERRA LAW, APLC
2 | 1 World Trade Center, Suite 800
Long Beach, CA 90831
3 | Telephone: (562) 983-8052
Facsimile: (562) 394-9210
4 |

5 | Attorneys for Plaintiff,
WAYNE ORKIN
6 |

FILED

2012 DEC 12  PM 3:33

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVSION**

10 |

11 | WAYNE ORKIN, an individual,

12 |                          Plaintiff,

13 |           vs.

14 |

15 | UNIFIED PAYMENTS, a business
entity of unknown form, OLEG FIRER,
16 | an individual, and DOES 1 through 50
inclusive,
17 |

18 |                          Defendants.

CASE NO. **2-10652** (SH)

**COMPLAINT FOR DAMAGES:**

**(1) BREACH OF CONTRACT;**
**(2) BREACH OF IMPLIED**
**COVENANT OF GOOD FAITH &**
**FAIR DEALING;**
**(3) MISAPPROPRATION;**
**(4) FRAUD & DECEIT;**
**(5) CONVERSION; AND**
**(6) INTENTIONAL INFLICTION**
**OF EMOTIONAL DISTRESS**

**DEMAND FOR JURY TRIAL**

19 |

20 | PLAINTIFF Wayne Orkin ("PLAINTIFF") alleges as follows:

21 | **JURISDICTION AND VENUE**

22 | 1.      Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 (a)(1)

23 | because PLAINTIFF is a resident of California and Defendants are residents of

24 | Florida and the amount in controversy exceeds $75,000.

25 | 2.      Venue is appropriate in this judicial district under 28 U.S.C. § 1391

26 | (b)(2) because the events which gave rise to the claims and damages alleged in this

27 | Complaint occurred in this district.

28 |

GUERRA LAW
(562) 983-8052

1

COMPLAINT FOR DAMAGES

1        **THE PARTIES**

2        3.      PLAINTIFF is, and was at all relevant times alleged herein until in or

3   about 2010, an individual residing in the County of Los Angeles.  At all other

4   subsequent times, PLAINTIFF has resided both in the County of Los Angeles, State

5   of California and The Dominican Republic.

6        4.      PLAINTIFF is informed and believes, and on that basis thereon alleges.

7   Defendant Unified Pay Corp. ("UNIFIED"), is, and was at all relevant times alleged,

8   a business entity of unknown form doing business in Miami-Dade County in the

9   State of Florida.

10       5.      PLAINTIFF is informed and believes, and on that basis thereon alleges

11  Defendant Oleg Firer ("FIRER"), is, and was at all relevant times alleged, an

12  individual residing in Miami-Dade County in the State of Florida.

13       6.      PLAINTIFF does not know the true names and capacities of the

14  Defendants sued herein as DOES 1 through 50, inclusive, and therefore PLAINTIFF

15  sues those Defendants by such fictitious names.  PLAINTIFF will amend this

16  Complaint to allege their true names and capacities when the same have been

17  ascertained.

18       7.      PLAINTIFF is informed and believes, and on that basis alleged, that

19  Defendants in this action, including the fictitiously named defendants, were and are

20  the agents, authorized representatives, joint ventures, partners, and/or alter egos of

21  one another and in doing the acts alleged in this Complaint did so jointly and for a

22  common purpose with the course and scope of his, her, or its authority as such

23  agent, representative, joint venture, partner, or alter ego with the knowledge,

24  consent, permissions, and ratification of each other.  PLAINTIFF is further informed

25  and believes, and on that basis alleges, the acts alleged in this complaint were in

26  furtherance of a conspiracy among the defendants, and all actions were taken

27  pursuant to that common design.  Defendants further the conspiracy by, among other

28  things, encouraging the acts of one another.

GUERRA LAW
(562) 983-8052

2

1       8.      PLAINTIFF is informed and believes, and on that basis alleges, at all
2   relevant times, there existed a unity of interest and ownership between the
3   Defendants such that any individuality and separateness between the Defendants
4   never existed or has ceased to exist, and that Defendants are the alter egos of each
5   other. PLAINTIFF is further informed and believes, and on that basis alleges, at all
6   relevant times, Defendants, including but not limited to FIRER and any and all
7   related entities, conceived, intended, and used each of the other Defendants as a
8   device for purposes of substituting financially for the other and/or avoiding liability
9   under state and federal law. PLAINTIFF is further informed and believes, and on
10   that basis alleges, at all relevant times, Defendants held themselves out to
11   PLAINTIFF and others as separately liable for debts of each Defendant, including
12   but not limited to liabilities to PLAINTIFF. PLAINTIFF is further informed and
13   believes, and on that basis alleges, Defendants, and each of them, used assets of
14   each of the other Defendants for their own purposes as though it were their own and
15   caused assets to be transferred between them or to entities they controlled.
16   PLAINTIFF is further informed and believes, and on that basis alleges, adherences
17   to the fiction of separate existence of Defendants, and each of them, as an entity
18   distinct from the other Defendants would permit an abuse of the corporate privilege,
19   would sanction fraud, and promote injustice, as well as set up the business of
20   Defendants to make an unfair profit from unlawful deprivation of the rights and
21   privileges afforded to employees under State and federal law.

22                      **BACKGROUND ALLEGATIONS**

23       9.      On or about April 15, 2002, PLAINTIFF incorporated an entity known
24   as First Business Solutions, Inc. in California ("FBS CALIFORNIA"). At all
25   relevant times alleged herein, FBS CALIFORNIA operated as a merchant services
26   company that used and sold services and, further, developed a payment browser
27   technology created by PLAINTIFF.

28

GUERRA LAW
(562) 983-8052

3

1      10.    On or about July 7, 2010, PLAINTIFF is informed and believes, and on

2  that basis thereon alleges, FIRER, and other presently-unknown individuals,

3  incorporated an entity known as FBS NEVADA for purposes of acquiring FBS

4  CALIFORNIA, including its assets and liabilities and payment browser intellectual

5  property developed by ORKIN.

6      11.    On or about July 9, 2010, an agreement was entered into between

7  PLAINTIFF and FBS NEVADA whereby ORKIN agreed to serve as President of

8  FBS NEVADA subject to payment of compensation in the amount of

9  $14,000/month for a term of 3-years. PLAINTIFF was initially an independent

10  contractor and thereafter paid as an employee by UNIFIED.  A copy of the

11  referenced agreement is attached as Exhibit A and incorporated by reference.

12      12.    PLAINTIFF is informed and believes, and on that basis alleges, on or

13  about July 9, 2010, the shareholders of FBS CALIFORNIA adopted and approved

14  resolutions to convey all related liabilities and assets to FBS NEVADA and were

15  subsequently formally acquired pursuant to an Asset Purchase Agreement.

16      13.    In connection with the foregoing agreement between FBS NEVADA

17  and ORKIN, the parties further verbally agreed to allow PLAINTIFF to continue to

18  sell the payment browser technology, which he developed, pursuant to an additional

19  written agreement that would be entered into.  Notwithstanding numerous

20  assurances by defendants over a period of time, it failed to propose or enter into

21  another agreement with ORKIN because it secretly usurped, as it intended to all

22  along, ORKIN's rights and royalties in or about January 2011 when UNIFIED

23  acquired FBS NEVADA.

24      14.    Pursuant to the foregoing agreements, at all relevant times alleged

25  herein, ORKIN physically worked from FBS NEVADA's Long Beach, California

26  offices using his best efforts and in furtherance of the company's mission.

27  PLAINTIFF is informed and believes, and on that basis alleges, Defendants

28  operated the business without any complaint about his performance with the venture

GUERRA LAW
(562) 983-8052

4

1    and/or the direction of the business.

2       15.    On or about May 2, 2011, PLAINTIFF was ousted from FBS
3    NEVADA without any prior notice and was further denied any further
4    compensation despite assurances from defendants regarding the necessity for
5    PLAINTIFF'S 3-year commitment to the venture. PLAINTIFF is informed and
6    believes, and on that basis alleges, from the outset Defendants fraudulently entered
7    into the foregoing agreements and transactions for the purpose of inducing and
8    obtaining PLAINTIFF's acquiescence to contract while all along intending to oust
9    him from the company and converting rights to the payment browser and related
10   property previously owned by ORKIN through FBS CALIFORNIA.

11      16.    At or about the same time PLAINTIFF was capriciously ousted from
12   his office space, Defendants deliberately and for no justifiable reason withheld and
13   converted PLAINTIFF's personal property which he maintained in the office,
14   including but not limited to 7-years' worth of tax returns, records, receipts, and
15   related financial and personal documents, and other personal property.

16      17.    As a direct and proximate result of defendants' unlawful possession
17   and conversion of PLAINTIFF's above-described property, PLAINTIFF has
18   incurred damages in the form of lost property and document replacement charges
19   and other penalties and interest. Defendants' actions caused PLAINTIFF to sustain
20   IRS and credit problems.

21      18.    PLAINTIFF is informed and believes, and on that basis alleges, FBS
22   CALIFORNIA and FBS NEVADA are inactive, defaulted entities, whose assets
23   were conveyed to UNIFIED and/or FIRER, which was in furtherance of defendants'
24   deliberate conspiracy so as to interfere with PLAINTIFF's legal rights.

25

26

27

28   //

GUERRA LAW
(562) 983-8052

5

# FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against all Defendants)

19.   PLAINTIFF re-alleges and incorporates by reference Paragraphs 1 through 18 as though fully set forth herein.

20.   As alleged previously, the parties entered into the subject agreements and transactions. PLAINTIFF fulfilled all terms and conditions under the subject agreements to the extent possible.

21.   Defendants failed to fulfill their respective duties and obligations under the subject agreements in a number of manners, including but not limited to: inducing PLAINTIFF to agree to sell FBS CALIFORNIA, including rights to the Payment Browser and related property, without any intentions of honoring defendants' end of the bargain; subjected PLAINTIFF to harassment and intimidation for purposes of creating a façade of sub-performance; unilaterally terminating PLAINTIFF without good cause; refusing to return PLAINTIFF's personal property; failing to compensate PLAINTIFF as agreed and failing to reimburse for out-of-pocket expenses, unpaid accrued vacation time, company benefits, and related damages.

22.   As a direct and proximate cause of defendants' breaches as alleged previously, PLAINTIFF has sustained general, compensatory, and consequential damages in a sum exceeding $500,000, the exact amount to be proven at trial according to proof.

# SECOND CAUSE OF ACTION

# BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING

### (Against all Defendants)

23.   PLAINTIFF re-alleges and incorporates by reference Paragraphs 1 through 22 as though fully set forth herein.

24.   The parties entered into the subject agreements as alleged previously.

GUERRA LAW
(562) 983-8052

6

1  Said agreements bestowed on each of the parties the implied promises to not
2  unfairly interfere with the rights of the other parties to receive the benefits of the
3  contracts and to act fairly and in good faith.

4      25.    PLAINTIFF did all significant things under the subject agreements that
5  were required of him in order to cause Defendants to perform thereunder as alleged
6  previously.

7      26.    Defendants failed to do a substantial majority of all significant things
8  required of them under the agreements, and were not legally excused from the same,
9  despite all conditions required for their performance occurred.

10     27.    Defendants unfairly interfered with PLAINTIFF's rights to receive the
11 benefits under the subject agreements, and thereby caused PLAINTIFF's harm by
12 engaging in the acts and omissions as alleged previously.

13     28.    As a direct and proximate cause of defendants' alleged conduct,
14 PLAINTIFF has sustained general damages in an amount exceeding $500,000, the
15 exact amount to be proven at trial according to proof.

16     29.    Defendants' conduct was undertaken with intentions to deprive
17 PLAINTIFF of his property, legal rights and/or to inflict injury. Defendant's
18 conduct was despicable and subjected PLAINTIFF to unjust hardship in conscious
19 disregard of his rights, so as to justify the imposition of exemplary and punitive
20 damages.

21              **THIRD CAUSE OF ACTION**
22  **MISAPPROPRIATION OF PAYMENT BROWSWER TECHNOLOGIES**
23              **(Against All Defendants)**

24     30.    PLAINTIFF re-alleges and incorporates by reference Paragraphs 1
25 through 29 as though fully set forth herein.

26     29.    At all relevant times until the transfer of assets from FBS
27 CALIFORNIA to FBS NEVADA, ORKIN was the legal and equitable owner of the
28 payment browser technology and all related interests and rights.

GUERRA LAW
(562) 983-8052

7

1    30.   At all relevant times, PLAINTIFF made a substantial investment of time,
2  effort, and money in creating the payment browser technology and through doing so
3  had a property or ownership rights to the same.

4    31.   PLAINTIFF is informed and believes, and thereon alleges, Defendants
5  unlawfully appropriated the payment browser technology at little or no cost in a
6  calculated manner to usurp all of PLAINTIFF's rights and interests in the payment
7  browser without payment of appropriate consideration before ousting PLAINTIFF
8  from the companies.  PLAINTIFF is informed and believes, and on that basis
9  alleges, UNIFIED and FIRER intended to misappropriate PLAINTIFF's property
10  and transferred the property from entity to entity multiple times so as to prevent
11  PLAINTIFF from pursuing his rights against the appropriate parties.  PLAINTIFF is
12  further informed and believes, and on that basis alleges, Defendants are utilizing the
13  payment browser technologies previously owned by Defendant and are promoting
14  brands developed by PLAINTIFF including onehealthsystem.com and
15  onedentalsystem.com.

16    32.   As a direct and proximate result of Defendants' acts, PLAINTIFF
17  sustained general damages for a sum exceeding $500,000 dollars, the exact amount
18  to be proven at trial according to proof.

19    33.   Defendants' conduct was undertaken with intentions to deprive
20  PLAINTIFF of his property, legal rights and/or to inflict injury.  Defendant's
21  conduct was despicable and subjected PLAINTIFF to unjust hardship in conscious
22  disregard of his rights, so as to justify the imposition of exemplary and punitive
23  damages.

24              **FOURTH CAUSE OF ACTION**
25            **FRAUD & INTENTIONAL DECEIT**
26                 **(Against All Defendants)**

27    35.   PLAINTIFF re-alleges and incorporates by reference Paragraphs 1
28  through 34 as though fully set forth herein.

COMPLAINT FOR DAMAGES

GUERRA LAW
(562) 983-8052

36.   At various times prior to the subject transactions, PLAINTIFF had numerous discussions with Defendants in the form of in-person conversations, telephone calls, and electronic communications regarding the Agreement as alleged previously, which legally constitute fraud in inception or execution, fraud in the inducement, and/or some fraudulent scheme to defraud PLAINTIFF and take unfair advantage.

37.   As a result of defendants' position, bargaining power, and leverage over PLAINTIFF, including but not limited to defendants' status as a partner, co-owner, and/or joint venturer, Defendants had a fiduciary relation with PLAINTIFF and occupied a confidential position of trust and repose at all relevant times.

38.   PLAINTIFF is informed and believes, and thereon alleges, defendants made a number of materially false misrepresentations, concealments, and/or deceitful representations: including but not limited to inducting PLAINTIFF to convey rights and title to the payment browser without any intentions of keeping him on board as President of the new company; engaging in a series of events without justification all designed to create a façade of sub-performance; using intimidation and overtly fraudulent tactics to create a strain in the parties' business relationship; unilaterally terminating PLAINTIFF from his position and refusing to pay compensation; amongst a number of other acts and omissions.

39.   At all relevant times, PLAINTIFF was unaware of the falsities of the representations and/or concealments.  PLAINTIFF relied on the same because PLAINTIFF entered into the subject agreements, performed to the extent possible and refrained from pursuing legal action at an earlier time, and refrained from utilizing his time, energy, ideas, skills, and efforts elsewhere and in furtherance of other endeavors.

40.   As a direct and proximate result of Defendants' representations and/or concealments, PLAINTIFF sustained general damages for a sum exceeding $500,000 dollars, the exact amount to be proven at trial according to proof.

9

GUERRA LAW
(562) 983-8052

41.    As a result of Defendants' aforesaid conduct, and to the extent PLAINTIFF is unable to establish actual or intentional fraud at trial, Defendants maintain the right to alternatively pursue a constructive fraud theory and seek the recovery all available damages allowed under applicable law.

42.    Defendants' conduct was undertaken with intentions to deprive PLAINTIFF of his property, legal rights and/or to inflict injury. Defendant's conduct was despicable and subjected PLAINTIFF to unjust hardship in conscious disregard of his rights, so as to justify the imposition of exemplary and punitive damages.

## FIFTH CAUSE OF ACTION

### CONVERSION

### (Against all Defendants)

43.    PLAINTIFF re-alleges and incorporates by reference Paragraphs 1 through 42 as though fully set forth herein.

44.    As alleged previously, PLAINTIFF was the owner of the personal property described in Paragraph 16.

45.    Defendants converted the subjected personal property for their own use and permanently disposed PLAINTIFF of the same.

46.    PLAINTIFF is entitled to all recoverable damages, including but not limited to attorney's fees and costs under applicable sections of *California Civil Code* in pursuit of the return of the property.

47.    As a direct and proximate result of defendants' aforesaid conduct, PLAINTIFF has sustained general and compensatory damages for a sum to be determined at trial according to proof.

## SIXTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against all Defendants)

48.    PLAINTIFF re-alleges and incorporates by reference Paragraphs 1

GUERRA LAW
(562) 983-8052

10

COMPLAINT FOR DAMAGES

1 through 47 as though fully set forth herein.

2     49.   Defendants, including FIRER who, on information and belief,
3 orchestrated a substantial majority of the events against PLAINTIFF, engaged in a
4 number of outrageous as alleged previously. The aforesaid acts were undertaken
5 deliberately and intentionally designed to cause PLAINTIFF severe emotional
6 distress.

7     50.   As a result of defendants' aforesaid conduct, PLAINTIFF suffered
8 severe emotional distress and sustained damages in a presently unknown amount to
9 be determined at trial according to proof.

10     51.   Defendants' conduct was undertaken with intentions to deprive
11 PLAINTIFF of his property, legal rights and/or to inflict injury. Defendant's
12 conduct was despicable and subjected PLAINTIFF to unjust hardship in conscious
13 disregard of his rights, so as to justify the imposition of exemplary and punitive
14 damages.

15 **PLAINTIFF PRAYS FOR A JUDGMENT AGAINST DEFENDANTS**
16 **AS FOLLOWS:**

17     1.   For general and compensatory damages in excess of $500,000, the
18 exact amount to be determined at trial according to proof;

19     2.   For pre-judgment and post-judgment interest;

20     3.   For exemplary/punitive damages for a sum to be determined at trial
21 according to proof;

22     4.   For treble damages the exact amount to be determined at trial according
23 to proof;

24     5.   For attorney's fees and costs of suit for a sum to be determined at trial
25 according to proof; and

26

27

28 //

GUERRA LAW
(562) 983-8052

11

1

2    6.    For such other relief as the Court may deem proper.

3    Dated: December 6, 2012                    GUERRA LAW, APLC

4

5                                          By:    _Jason E. Guerra_

6                                                JASON E. GUERRA
                                                Attorneys for Plaintiff
7                                                WAYNE ORKIN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

COMPLAINT FOR DAMAGES

# EXHIBIT A

**EXECUTIVE EMPLOYMENT AGREEMENT**
**FIRST BUSINESS SOLUTIONS CORP.**

THIS **EXECUTIVE EMPLOYMENT AGREEMENT** (this "**Agreement**") is made between First Business Solutions Corp., a Nevada corporation (the "**Company**"), and Wayne Orkin ("**Executive**") (collectively sometimes referred to as the "**Parties**" and individually sometimes referred to as a "**Party**"). Unless otherwise indicated, all references to Sections are to Sections in this Agreement. This Agreement is effective as of the "**Effective Date**" set forth below.

**W I T N E S S E T H:**

**WHEREAS**, the Company desires to obtain the services of Executive, and Executive desires to be employed by the Company upon the terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the premises, the agreements herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as of the date hereof as follows:

**1. Employment.** The Company hereby agrees to employ Executive, and Executive hereby agrees to serve the Company, as President ("**Employment**") for a period of three (3) years beginning on the Effective Date (the "**Term**"). This Agreement is renewable for successive one year terms subject to notification of termination per Section 11. The "**Effective Date**" of the Employment shall be July 9, 2010.

**2. Scope of Employment.** During the Employment, Executive will serve as President. In that connection, Executive will (i) devote his full-time (i.e., an average minimum of 40 hours per week), attention, and energies to the business of the Company and will diligently and to the best of his ability perform all duties incident to his employment hereunder; (ii) use his best efforts to promote the interests and goodwill of the Company; and (iii) perform such other duties commensurate with his office as his superiors at the Company may from time-to-time assign to him.

**3. Compensation and Benefits During Employment.** During the Employment, the Company shall provide compensation to Executive as follows.

(a) <u>Base Salary</u> - The Company shall pay Executive a minimum base salary, as may be adjusted from time to time, equal to $14,000.00 per month (the "Salary"), beginning on the Effective Date of this Agreement and ending at the end of the Term or upon the termination of this Agreement as provided below, and payable at the rate of 1/2 of the Salary on the first and 15th of each month of the Term of this Agreement.

(b) <u>Expenses</u> - So long as this Agreement is in effect, the Company shall reimburse Executive for all reasonable, out-of-pocket business expenses incurred in the performance of his duties hereunder consistent with the Company's policies and procedures, in effect from time to time, with respect to travel, entertainment and other business expenses customarily reimbursed to senior Executives of the Company in connection with the performance of their duties on behalf of the Company. Pre-approval in writing will be required for any amounts in excess of $1,000.

(c) <u>PTO</u> - Executive will be entitled to three (3) weeks annually of paid time off ("**PTO**") during the Term, not including holidays. Unused PTO days shall not roll-over into any extension of the Term. Other than the use of PTO days for illness or personal emergencies, PTO days must be pre-approved by the Company.

Initials ___ / ___   Page 1

(d)     Profit Sharing - Executive shall be entitled to 20% (twenty percent) of the Net Income, if any, of the Company "Profit Sharing". Such Profit Sharing will be calculated on a quarterly basis and paid within forty five days from the end of each quarter. "Net Income" shall be defined as the revenues of the Company for each quarter minus all of the expenses of the Company including, cost of revenues, operating expenses, general and administrative expenses, depreciation, amortization, interest expense and other items of expense of the Company for such quarter. The terms and conditions of the Profit Sharing shall be subject to review and revision (either upward or downward) on an annual basis in the sole and absolute discretion of the Company's Board of Directors, based on factors which may include the level of Net Income generated by the Company as directly attributable to Executive's service to the Company during the prior fiscal year and the Company's future projected Net Income, provided that the Company gives the Executive prompt notice of any changes in the Profit Sharing.

(e)     Benefits - Executive shall be entitled to participate in all Company employee benefit plans and programs (excluding severance plans, if any) as Company generally maintains from time to time during the Term for the benefit of its senior executive-level employees, in each case, subject to the eligibility requirements, enrollment criteria and other terms and provisions of such plans or programs. Company may amend, modify or rescind any employee benefit plan or program and change employee contribution amounts to benefit costs without notice in its discretion.

### 4. Confidential Information.

(a) Executive acknowledges that the law provides the Company with protection for its trade secrets and confidential information. Executive will not disclose, directly or indirectly, any of the Company's confidential business information or confidential technical information to anyone without authorization from the Company's management. Executive will not use any of the Company's confidential business information or confidential technical information in any way, either during or after the Employment with the Company, except as required in the course of the Employment.

(b) Executive will strictly adhere to any obligations that may be owed to former employers insofar as Executive's use or disclosure of their confidential information is concerned.

(c) Information will not be deemed part of the confidential information restricted by this Section 4 if Executive can show that: (i) the information was in Executive's possession or within Executive's knowledge before the Company disclosed it to Executive; (ii) the information was or became generally known to those who could take economic advantage of it through no action of Executive; (iii) Executive obtained the information from a party having the right to disclose it to Executive without violation of any obligation to the Company, or (iv) Executive is required to disclose the information pursuant to legal process (e.g., a subpoena), provided that Executive notifies the Company immediately upon receiving or becoming aware of the legal process in question. No combination of information will be deemed to be within any of the four exceptions in the previous sentence, however, whether or not the component parts of the combination are within one or more exceptions, unless the combination itself and its economic value and principles of operation are themselves within such an exception or exceptions.

(d) All originals and all copies of any drawings, blueprints, manuals, reports, computer programs or data, notebooks, notes, photographs, and all other recorded, written, or printed matter relating to research, manufacturing, operations, or business of the Company made or received by Executive during the Employment are the property of the Company. Upon termination of the Employment, Executive will immediately deliver to the Company all property of the Company which may still be in Executive's possession. Executive will not remove or assist in removing such property from the Company's premises under any circumstances, either during the Employment or after

Initials _____ / _____    Page 2

termination thereof, except as authorized by the Company's management.

(e) For a period of one (1) year after the date of termination of the Employment, Executive will not, either directly or indirectly, hire or employ or offer or participate in offering employment to any person who at the time of such termination or at any time during such one year period following the time of such termination was an Executive of the Company without the prior written consent of the Company.

## 5. Ownership of Intellectual Property.

(a) The Company will be the sole owner of any and all of Executive's Inventions that are related to the Company's business, as defined in more detail below.

(b) For purposes of this Agreement, "**Inventions**" means all inventions, discoveries, and improvements (including, without limitation, any information relating to manufacturing techniques, processes, formulas, developments or experimental work, work in progress, or business trade secrets), along with any and all other work product relating thereto.

(c) An Invention is "related to the Company's business" ("**Company-Related Invention**") if it is made, conceived, or reduced to practice by Executive (in whole or in part, either alone or jointly with others, whether or not during regular working hours), whether or not potentially patentable or copyrightable in the U.S. or elsewhere, and it either: (i) involves equipment, supplies, facilities, or trade secret information of the Company; (ii) involves the time for which Executive was or is to be compensated by the Company; (iii) relates to the business of the Company or to its actual or demonstrably anticipated research and development; or (iv) results, in whole or in part, from work performed by Executive for the Company.

(d) Executive will promptly disclose to the Company, or its nominee(s), without additional compensation, all Company-Related Inventions.

(e) Executive will assist the Company, at the Company's expense, in protecting any intellectual property rights that may be available anywhere in the world for such Company-Related Inventions, including signing U.S. or foreign patent applications, oaths or declarations relating to such patent applications, and similar documents.

(f) To the extent that any Company-Related Invention is eligible under applicable law to be deemed a "work made for hire," or otherwise to be owned automatically by the Company, it will be deemed as such, without additional compensation to Executive. In some jurisdictions, Executive may have a right, title, or interest ("**Right**," including without limitation all right, title, and interest arising under patent law, copyright law, trade-secret law, or otherwise, anywhere in the world, including the right to sue for present or past infringement) in certain Company-Related Inventions that cannot be automatically owned by the Company. In that case, if applicable law permits Executive to assign Executive's Right(s) in future Company-Related Inventions at this time, then Executive hereby assigns any and all such Right(s) to the Company, without additional compensation to Executive; if not, then Executive agrees to assign any and all such Right(s) in any such future Company-Related Inventions to the Company or its nominee(s) upon request, without additional compensation to Executive.

6. **Non-competition/Non-Solicitation.** As a condition to, and in consideration of, the Company's entering into this Agreement, and giving Employee access to certain confidential and proprietary information, which Executive recognizes is valuable to the Company and, therefore, its protection and maintenance constitutes a legitimate interest to be protected by the provisions of this

Initials ___ / ___ Page 3

Section 6 as applied to Executive and other employees similarly situated to Executive, and for ten dollars ($10) and other good and valuable consideration, the receipt and sufficiency of which Executive hereby acknowledges, Executive acknowledges and hereby agrees as follows:

(a) that Executive is and will be engaged in the business of the Company;

(b) that during the period of Executive's Employment under this Agreement, Executive will become familiar with the Company's trade secrets and with other proprietary and confidential information concerning the Company;

(c) that the obligations of this Agreement are directly related to the Employment and are necessary to protect the Company's legitimate business interests; and that the Company's need for the covenants set forth in this Agreement is based on the following: (i) the substantial time, money and effort expended and to be expended by the Company in developing technical designs, technology, processes, materials, equipment, marketing plans and similar confidential information; (ii) the fact that Executive will be personally entrusted with the Company's confidential and proprietary information; (iii) the fact that, after having access to the Company's technology and other confidential information, Executive could become a competitor of the Company; and (iv) the highly competitive nature of the Company's industry, including the premium that competitors of the Company place on acquiring proprietary and competitive information; and

(d) that for a period commencing on the Effective Date and ending twelve (12) months following termination as provided in Section 11, Executive will not, directly or indirectly, serve as Executive, agent, consultant, stockholder, director, co-partner or in any other individual or representative capacity, own, operate, manage, control, engage in, invest in or participate in any manner in, act as consultant or advisor to, render services for (alone or in association with any person, firm, corporation or entity), or otherwise assist any person or entity that directly or indirectly engages or proposes to engage in (i) the same, or a substantially similar, type of business as that in which the Company engages; or (ii) the business of distribution or sale of (A) products and services distributed, sold or license by the Company at the time of termination; or (B) products and services proposed at the time of termination to be distributed, sold or licensed by the Company, anywhere in the United States (collectively, the "**Territory**"); provided, however

(e) that nothing contained herein shall be construed to prevent Executive from investing in the stock or securities of any competing corporation listed on any recognized national securities exchange or traded in the over the counter market in the United States, but only if (i) such investment is of a totally passive nature and does not involve Executive devoting time to the management or operations of such corporation and Executive is not otherwise involved in the business of such corporation; and if (ii) Executive and his associates (as such term is defined in Regulation 14(A) promulgated under the Securities Exchange Act of 1934, as amended, as in effect on the Effective Date), collectively, do not own, directly or indirectly, more than an aggregate of two percent (2%) of the outstanding stock or securities of such corporation.

(f) The Parties acknowledge that the foregoing restrictions, as well as the duration and the territorial scope thereof as set above, are under all of the circumstances reasonable and necessary for the protection of the Company and its business.

(g) Executive agrees that at no time after his employment with the Company will he engage in competition with the Company while making any use of the Company's confidential information (as described in Section 4)(the "**Confidential/Trade Secret Information**"), or otherwise exploit or make use of the Confidential/Trade Secret Information. Executive agrees that during the twelve month period following the date his employment with the Company is terminated, he will not

Initials ___ / ___ Page 4

directly or indirectly accept or solicit, in any capacity, the business of any customer of the Company with whom Executive worked or otherwise had access to the Confidential/Trade Secret Information pertaining to the Company's business with such customer during the last year of Executive's employment with the Company, or solicit, directly or indirectly, or encourage any of the Company's customers or suppliers to terminate their business relationship with the Company, or otherwise interfere with such business relationships.

(h) Executive agrees that during the twelve month period following the termination date of Executive's employment with the Company, he shall not, directly or indirectly, solicit or otherwise encourage any employees of the Company to leave the employ of the Company, or solicit, directly or indirectly, any of the Company's employees for employment.

(i) During his employment with the Company, Executive shall not: (a) interfere with the Company's business relationship with its customers or suppliers, (b) solicit, directly or indirectly, or otherwise encourage any of the Company's customers or suppliers to terminate their business relationship with the Company, or (c) solicit, directly or indirectly, or otherwise encourage any employees of the Company to leave the employ of the Company, or solicit any of the Company's employees for employment.

7. **Legal Fees and Expenses.** In the event of a lawsuit, arbitration, or other dispute-resolution proceeding between the Company and Executive arising out of or relating to this Agreement, the prevailing party, in the proceeding as a whole and/or in any interim or ancillary proceedings (e.g., opposed motions, including without limitation motions for preliminary or temporary injunctive relief) will be entitled to recover its reasonable attorneys' fees and expenses unless the court or other forum determines that such a recovery would not serve the interests of justice.

8. **Successors.**

(a) This Agreement shall inure to the benefit of and be binding upon (i) the Company and its successors and assigns; (ii) Executive and Executive's heirs and legal representatives, except that Executive's duties and responsibilities under this Agreement are of a personal nature and will not be assignable or delegable in whole or in part; and (iii) the Executive Parties as provided in Section 10.

(b) The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation, Acquisition or otherwise) to all or substantially all of the business and/or assets of the Company to assume expressly and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place. As used in this Agreement, the "Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

9. **Arbitration.**

(a) Except as set forth in paragraph (b) of this Section 9 or to the extent prohibited by applicable law, any dispute, controversy or claim arising out of or relating to this Agreement will be submitted to binding arbitration before a single arbitrator in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association in effect on the date of the demand for arbitration. The arbitration shall take place before a single arbitrator, who will be a lawyer. Unless otherwise agreed by the parties, the arbitration shall take place in Miami, Florida. The arbitrator is hereby directed to take all reasonable measures not inconsistent with the interests of justice to expedite, and minimize the cost of, the arbitration proceedings.

Initials ___ ___ Page 5

(b) To protect inventions, trade secrets, or other confidential information of Section 4, and/or to enforce the non-competition provisions of Section 6, the Company may seek temporary, preliminary, and/or permanent injunctive relief in a court of competent jurisdiction, in each case, without waiving its right to arbitration.

(c) At the request of either party, the arbitrator may take any interim measures he/she deems necessary with respect to the subject matter of the dispute, including measures for the preservation of confidentiality set forth in this Agreement.

(d) Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.

### 10. Indemnification.

(a) The Company agrees to indemnify and hold harmless Executive, his nominees and/or assigns (a reference in this Section 10 to Executive also includes a reference to Executive's nominees and/or assigns) against any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements (incurred in any and all actions, suits, proceedings and investigations in respect thereof and any and all legal and other costs, expenses and disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise), including without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any such action, suit, proceeding or investigation that is in any way related to the Executive's employment with the Company (whether or not in connection with any action in which the Executive is a party). Such indemnification does not apply to acts performed by Executive, which are criminal in nature or a violation of law. The Company also agrees that Executive shall not have any liability (whether direct or indirect, in contract or tort, or otherwise) to the Company, for, or in connection with, the engagement of the Executive under the Agreement, except to the extent that any such liability resulted primarily and directly from Executive's gross negligence and willful misconduct.

(b) These indemnification provisions shall be in addition to any liability which the Company may otherwise have to Executive or the persons indemnified below in this sentence and shall extend to the following: the Executive, his affiliated entities, partners, executives, legal counsel, agents, and controlling persons (within the meaning of the federal securities laws), and the officers, directors, executives, legal counsel, agents, and controlling persons of any of them (collectively, the "Executive Parties").

(c) If any action, suit, proceeding or investigation is commenced, as to which any of the Executive parties propose indemnification under the Agreement, they shall notify the Company with reasonable promptness; provided however, that any failure to so notify the Company shall not relieve the Company from its obligations hereunder. The Executive Parties shall have the right to retain counsel of their own choice (which shall be reasonably acceptable by the Company) to represent them, and the Company shall pay fees, expenses and disbursements of such counsel; and such counsel shall, to the extent consistent with its professional responsibilities, cooperate with the Company and any counsel designated by the Company. The Company shall be liable for any settlement of any claim against the Executive Parties made with the Company's written consent, which consent shall not be unreasonably withheld. The Company shall not, without the prior written consent of the party seeking indemnification, which shall not be unreasonably withheld, settle or compromise any claim, or permit a default or consent to the entry of any judgment in respect thereof, unless such settlement, compromise or consent includes, as an unconditional term thereof, the giving by the claimant to the party seeking indemnification of an unconditional release from all liability in respect of such claim.

Initials ___ / ___ Page 6

(d) The indemnification provided by this Section 10 shall not be deemed exclusive of, or to preclude, any other rights to which those seeking indemnification may at any time be entitled under the Company's organizational documents, any law, agreement or vote of shareholders or disinterested Directors, or otherwise, or under any policy or policies of insurance purchased and maintained by the Company on behalf of Executive, both as to action in his Employment and as to action in any other capacity.

(f) Neither termination nor completion of the Employment shall effect these indemnification provisions which shall then remain operative and in full force and effect.

## 11. Termination.

This Agreement and the employment relationship created hereby will terminate (i) upon the disability or death of Executive under Section 11(a) or 11(b); (ii) with cause under Section 11(c); (iii) for good reason under Section 11(d); (iv) without good reason under Section 11(e); or (v) without cause under Section 11(f).

(a) *Disability.* The Company shall have the right to terminate the employment of Executive under this Agreement for disability in the event Executive suffers an injury, illness, or incapacity of such character as to substantially disable him from performing his duties without reasonable accommodation by Executive hereunder for a period of more than thirty (30) consecutive days upon Company giving at least thirty (30) days written notice of termination.

(b) *Death.* This Agreement will terminate immediately on the Death of the Executive.

(c) *With Cause.* The Company may terminate this Agreement immediately, and without providing any prior written notice to Executive, at any time because of, (i) the indictment of Executive of an act or acts constituting a felony or other crime involving moral turpitude, dishonesty or theft or fraud; (ii) Executive's negligence or insubordination in the performance of his duties hereunder, after having been given written notice with reasonable detail and an opportunity to cure within 15 days, unless the Company has experienced a material loss due to such negligence or insubordination, in which case Executive shall be terminated immediately without any opportunity to cure; (iii) Executive's lack of performance of his duties hereunder, after having been given written notice with reasonable detail and an opportunity to cure within 15 days, unless the Company has experienced a material loss due to Executive's lack of performance, in which case Executive shall be terminated immediately without any opportunity to cure; or (iv) Executive's breach of any material provision of this Agreement.

(d) *Good Reason.* The Executive may terminate his employment for "Good Reason" by giving Company ten (10) days written notice if:

(i) he is assigned, without his express written consent, any duties materially inconsistent with his positions, duties, responsibilities, or status with the Company as of the date hereof, or a change in his reporting responsibilities or titles as in effect as of the date hereof;

(ii) his compensation is materially reduced;

Initials ⟨W⟩ / ⟨M⟩ Page 7

(iii) the Company does not pay any material amount of compensation due hereunder and then fails either to pay such amount within the ten (10) day notice period required for termination hereunder or to contest in good faith such notice. Further, if such contest is not resolved within thirty (30) days, the Company shall submit such dispute to arbitration under Section 9; or

(iv) the requirement that Executive relocate to another location of the Company outside a thirty (30) mile radius from the location of Executive's office as of the date hereof.

(e) *Without Good Reason.* The Executive can terminate this Agreement at any time for any reason provided that he gives the Company thirty (30) days prior written notice of such intent to terminate.

(f) *Without Cause.* The Company can terminate this Agreement at any time without cause.

12. **Obligations of Company Upon Termination.**

(a) In the event of the termination of Executive's employment pursuant to Section 11(a), (b), (c) , or (e), Executive will be entitled only to the compensation earned by him hereunder as of the date of such termination.

(b) In the event of the termination of Executive's employment pursuant to Section 11(d) or 11(f), Executive will be entitled to receive as severance pay, the compensation earned by him hereunder as of the date of such termination and an amount equal to the lesser of (a) six months of Executive's Salary plus six months of Profit Sharing due hereunder; and (b) the remaining amount of Salary due to Executive and Profit Sharing during the Term in one lump sum, in sole consideration of such termination. The Executive agrees to execute and deliver to the Company a written release in form and substance satisfactory to the Company, of any and all claims against the Company and all directors and officers of the Company with respect to all matters arising out of Executive's Employment hereunder, or the termination thereof (other than claims for entitlements under the terms of this Agreement or plans or programs of the Company in which Executive has accrued a benefit); and (B) Executive must not breach any of his covenants and agreements which continue following the date of termination of this Agreement.

(c) Upon termination of Executive's Employment hereunder, or on demand by the Company during the Term of this Agreement, Executive will immediately deliver to the Company, and will not keep in his possession, recreate or deliver to anyone else, any and all Company property, as well as all devices and equipment belonging to the Company (including computers, handheld electronic devices, telephone equipment, and other electronic devices), Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, photographs, charts, all documents and property, and reproductions of any of the aforementioned items that were developed by Executive pursuant to his employment with the Company, obtained by Executive in connection with his Employment with the Company, or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to this Agreement.

(d) Upon termination of Executive's Employment hereunder, Company and Executive will enter into a perpetual Independent Sales Organization Agreement ("ISO Agreement"), or other

Initials  Page 8

similar agreement, whereby Executive will be able to sell the Payment Browser and related products. Such ISO Agreement will have a revenue split of 80% for Executive and 20% for Company, amongst other standard terms as mutually agreed between the parties.

13. **Other Provisions.**

(a) All notices and statements with respect to this Agreement must be in writing. Notices to the Company shall be delivered to the Manager of the Company. Notices to Executive may be delivered to Executive in person or sent to Executive's then-current mailing address as indicated in the Company's records.

(b) This Agreement sets forth the entire agreement of the parties concerning the subjects covered herein; there are no promises, understandings, representations, or warranties of any kind concerning those subjects except as expressly set forth in this Agreement.

(c) Any modification of this Agreement must be in writing and signed by all parties; any attempt to modify this Agreement, orally or in writing, not executed by all parties will be void.

(d) If any provision of this Agreement, or its application to anyone or under any circumstances, is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability will not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and will not invalidate or render unenforceable such provision or application in any other jurisdiction.

(e) This Agreement will be governed and interpreted under the laws of the United States of America and the laws of the State of Florida.

(f) No failure on the part of any party to enforce any provisions of this Agreement will act as a waiver of the right to enforce that provision.

(g) Section headings are for convenience only and shall not define or limit the provisions of this Agreement.

(h) This Agreement may be executed in several counterparts, each of which is an original. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts. A copy of this Agreement signed by one party and faxed to another party shall be deemed to have been executed and delivered by the signing party as though an original. A photocopy of this Agreement shall be effective as an original for all purposes.

(i) Non-Disparagement. Executive will not at any time (during or after Executive's employment with Company) disparage the reputation of Company, its affiliates and their respective customers and merchants and its or their respective officers, managers, directors, agents or executives.

(j) Cooperation. Executive agrees to cooperate both during and after Executive's employment with the Company, at the Company's sole cost and expense, with the investigation by the Company involving the Company or any executive or agent of the Company.

(k) No Attachment. Except as required by law, no right to receive payments under this Agreement shall be subject to anticipation, commutation, alienation, sale, assignment, encumbrance, charge, pledge, or hypothecation or to execution, attachment, levy, or similar process or assignment by operation of law, and any attempt, voluntary or involuntary, to effect any such action shall be null, void and of no effect.

Initials _____ Page 9

(l) Limitation as to Amounts Payable. In the event that any payment, coverage or benefit provided under this Agreement would, in the opinion of counsel for the Company, not be deemed to be deductible in whole or in part in the calculation of the Federal income tax of Company, or any other person making such payment or providing such coverage or benefit, by reason of Section 280G of Internal Revenue Code of 1986, as amended (the "Code"), the aggregate payments, coverages or benefits provided under this Agreement shall be reduced to the "safe harbor" level under Section 280G so that the entire amount which is paid to Executive shall be deductible notwithstanding the provisions of Section 280G of the Code.

(m) Executive Withholdings and Deductions. All payments to Executive hereunder shall be subject to such withholding and other Executive deductions as may be required by law.

(n) Legal Counsel. Executive acknowledges and warrants that (A) he has been advised that Executive's interests may be different from the Company's interests, (B) he has been afforded a reasonable opportunity to review this Agreement, to understand its terms and to discuss it with an attorney and/or financial advisor of his choice and (C) he knowingly and voluntarily entered into this Agreement. The Company and Executive shall each bear their own costs and expenses in connection with the negotiation and execution of this Agreement.

[Remainder of page left intentionally blank.]

Initials _____ / _____   Page 10

This Agreement contains provisions requiring binding arbitration of disputes. By signing this Agreement, Executive acknowledges that he (i) has read and understood the entire Agreement; (ii) has received a copy of it (iii) has had the opportunity to ask questions and consult counsel or other advisors about its terms; and (iv) agrees to be bound by it. Executed to be effective as of the Effective Date.

FIRST BUSINESS SOLUTIONS CORP.:

Oleg Firer
CEO

Date: 7/9/2010

EXECUTIVE:

Wayne Orkin
President

Date: 7/9/10

Initials _____/_____    Page 11

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Manuel Real and the assigned discovery Magistrate Judge is Stephen J. Hillman.

The case number on all documents filed with the Court should read as follows:

## CV12- 10652 R (SHx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

Unless otherwise ordered, the United States District Judge assigned to this case will hear and determine all discovery related motions.

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| WAYNE ORKIN, an individual, | UNIFIED PAYMENTS, a business entity of unknown form, OLEG FIRER, an individual, and DOES 1 through 10, inclusive, |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Jason E. Guerra, Esq. Guerra Law, APLC<br>1 World Trade Center, Suite 800, Long Beach, CA 90831 (562) 983-8052 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ 500,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. § 1332 (a)(1)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV12-10652**

FOR OFFICE USE ONLY: Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Miami-Dade County (Florida) as to both defendants |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County as to all claims | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): *Lasser P. Schuller*     Date December 6, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |